**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| LINDA CHRISTINE SUN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. Action No. 12-1919 (ABJ) |
| | ) | |
| DISTRICT OF COLUMBIA | ) | |
| GOVERNMENT, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## <u>MEMORANDUM OPINION</u>

Plaintiff Linda Sun, a former employee of the District of Columbia Office of the Tenant Advocate ("OTA"), has sued the District of Columbia, OTA Director Johanna Shreve, and OTA General Counsel Dennis Taylor for wrongful termination, discrimination, and retaliation. The claims against Shreve and Taylor have been brought against them in both their official and individual capacities. The federal claims arise under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, and 42 U.S.C. § 1981, *see* Second Am. Compl. [Dkt. # 20] ("Am. Compl.") at 7–8, 9, and plaintiff has also brought state and common law claims, invoking the Court's supplemental jurisdiction. *See* Am. Compl. at 1, citing 28 U.S.C. § 1367.

Following a period of discovery, each party moved for summary judgment. *See* Defs.' Mot. for Summ. J., [Dkt. # 64]; Pl.'s Mot. for Summ. J. [Dkt. # 73]. Upon consideration of the motions, oppositions, replies, and supporting documentation, the Court will grant defendants' motion in part and deny it in part, and it will deny plaintiff's motion. Count VII of the Second Amended Complaint for Assault will remain.

I.      **BACKGROUND**

Plaintiff was born in Shanghai, China, and became a naturalized United States citizen in May 1972.  Am. Compl. ¶ 3.  In 2004, plaintiff graduated from Northwestern California University Law School, but she has not passed a bar exam and is not admitted to practice law in any jurisdiction.  Defs.' Statement of Undisputed Material Facts [Dkt. # 64] ("Defs.' SOF") at 43–48, ¶ 1.  OTA hired plaintiff in September 2007 as a Program Support Specialist.  Defs.' SOF ¶ 2.  OTA "provides technical advice and other legal services to tenants regarding disputes with landlords, including legal representation through lawyers [it] employe[s]."  Defs.' SOF ¶ 2.  Plaintiff's job included explaining to tenants "on a daily basis" the D.C. Municipal Regulations covering security deposits and housing code violations.  Dep. of Sun [Dkt. # 64-1] ("Sun Dep.") at 47:15–19.  In addition, plaintiff assisted with mediations in the Office of Administrative Hearings, advised clients on strategy, and "collected judicial opinions and constructed a formula for how much of a rebate to request from a specific judge."  Defs.' SOF ¶ 4, citing Sun Dec. 14, 2010 Email [Dkt. # 64-4] and Sun Dep. at 68:14–69:12.

The undisputed evidence reveals that there came a time when defendant Dennis Taylor, who was plaintiff's immediate supervisor, expressed concerns about plaintiff's engaging in the unauthorized practice of law.  Sun Dep. at 98:10–14.  In February 2009, Taylor sent plaintiff an email titled "Misleading Statement," in which he informed plaintiff that her email to attorney Parag Khandhar asking for help in representing an individual in Small Claims Court since she was "not able to do so myself" was "highly misleading."  Taylor Email, Defs.' Ex. 9 [Dkt. # 64-9] at 2.  Taylor stated that "[a] reasonable person would read the segment as a peer-to-peer, attorney-to-attorney communication in which you ask Mr. Khandhar to represent a client for you because you have a schedule conflict."  *Id.*  Taylor further stated: "[w]e have previously discussed your

statements of being an attorney or a lawyer and we have addressed your previous practice of including 'J.D.' in your email signature.  However, you must also think of how both a lay person and a lawyer would interpret your words.  Please be very careful to not in any way imply that you are a lawyer.  I do not want you to run afoul of District law." *Id.*

Plaintiff responded by acknowledging that Taylor's "point is well taken if there had been no discussion with Parag and this is the first time we are communicating."  Sun Feb. 12, 2009 Email, Defs.' Ex. 9 [Dkt. # 64-9] at 3.  Plaintiff explained that she had informed Khandhar in a meeting "several weeks ago" that she was not an attorney and conveyed the difficulties OTA clients "who do not speak English well" had in getting help from legal services organization because of the language barrier.  *Id.*  Plaintiff then admonished her supervisor:

> The danger in statements such as yours once again warn, charge, and insinuate wrongdoing without sufficient background knowledge. Unless you have been in on the discussions from the very beginning going back to several months of communication, it is easy to jump to conclusions based on supervision information.  . . . I think it is also important that you take the time to ask before reaching conclusions.  One of my law professors who clerked for Justice Thurgood Marshall said he always told his clerks, "Never assume anything, because it makes an ass out of you and me."

*Id.*

The record reflects the fact that plaintiff's unauthorized practice of law remained an ongoing concern at the agency, and that plaintiff's superiors received complaints from multiple individuals.  For example, in May of 2009, the issue was raised by an opposing counsel in a landlord-tenant matter, who wrote Taylor to complain.

> After more than two hours, the Tenant . . . and I came to an agreement.  Ms. Sun, who referred to [the Tenant] as her 'client; then suggested that she wanted to leave the hearing room with [the Tenant] . . . . I correctly anticipated [that] Ms. Sun was seeking to undo the agreement.  At that point, I asked Ms. Sun if she was a lawyer, she responded yes, and volunteered that she was not admitted to practice in D.C.  I didn't ask her if she was admitted in any other jurisdiction.  You have represented to me that she is

> not . . . . You and I both know a lawyer is not just a graduate of a law school, but someone admitted to practice in the jurisdiction they're practicing in and in good standing.

Brodsky May 20, 2009 Letter, Defs.' Ex. 6 [Dkt. # 64-6] at 1.

The legislative director of OTA raised the issue again in June 2010, sending an email to OTA Director Johanna Shreve and copying Taylor, stating:

> [I]n a conversation I had with Judge Jennifer Long about another matter, she alluded to chronic difficulties she and other ALJs are having with Ms. Sun in terms of appearances at hearings and mediations and the "unauthorized practice of law." She said Ms. Sun showed up at a hearing either this week or last week and was turned away, but regardless Judge Long's understanding is that (as a matter of OTA policy or by agreement with OAH?) Ms. Sun would always be accompanied by other OTA staff for purposes of any OAH case. Finally, she said many judges are aware of the work OTA does, but others only know of OTA through Ms. Sun's transgressions and she regrets that the agency's image seems to suffer accordingly.[1]

Cohn June 25, 2010 Email, Defs.' Ex. 7, [Dkt. # 64-7] at 1.

In March 2011, an OTA attorney filed a formal complaint with Shreve with respect to actions plaintiff had taken in a particular landlord-tenant matter involving a former OTA client who was represented by outside counsel. Gibbs Letter, Defs.' Ex. 8, [Dkt. # 64-8] at 1.[2] In October 2010, the OTA attorney, at plaintiff's request, drafted a tenant petition to file with the D.C. Housing Department. *Id.* at 1. The landlord in turn filed a petition in landlord-tenant court for possession of the tenant's unit. *Id.* The parties reached a settlement agreement, and upon receipt of the settlement check, the tenant's attorney filed a motion to withdraw the tenant petition. *Id.*

---

1   OAH is the D.C. Office of Administrative Hearings.

2   The OTA attorney's letter "is in Microsoft Word format with an auto-date feature" that is activated whenever the document is opened. Thus, it contains an October 2014 date rather than the creation date. Defs.' SOF at 3, n.2. The accompanying email states that the complaint was given to Shreve on March 2, 2011. *See* Gibbs Mar. 2, 2011 Email, Defs.' Ex. 8.

The OTA attorney wrote that when the tenant "received notice that the [settlement] check had deducted a per diem amount pursuant to the agreement," the tenant "breached the agreement by repudiating her motion to withdraw the tenant petition" and dismissed the attorney. *Id.* The OTA attorney wrote:

> It has now come to my attention that Ms. Sun has been speaking with [the tenant] confidentially and providing her with legal advice contrary to that provided by [the tenant's counsel] and myself. Ms. Sun even went so far as to take [the tenant] to consult with a separate attorney yesterday morning. [The tenant] certainly has the right to consult with an attorney, as Mr. Taylor and I recommended she do [in their meeting with the tenant following the filing of the motion to withdraw], but Ms. Sun is an employee and an agent of this office, and must act as such. . . . Until I am confident that Ms. Sun will comply with my instructions I give to her and refrain from offering independent legal advice, I cannot allow her to have contact with any of my clients. As [her] actions have the potential to legally bind me and I cannot with confidence say that she will following any direction I might attempt to give her, I cannot accept any assistance from her whatsoever.

*Id.* at 1–2.

The record also reveals that on March 16, 2011, Taylor communicated with Human Resources about replacing an unnamed Case Management Specialist who "[i]n addition to her insubordination, . . . insist[ed] on engaging in the unauthorized practice of law." Taylor Mar. 16, 2011 Email, Defs.' Ex. 12 [Dkt. # 64-12]. He added that "[w]e fear for Bar Counsel retributions." *Id.* And plaintiff admits that she and Taylor "had this argument about unauthorized practice of law[.]" Sun Dep. at 98:10–11.

Plaintiff alleges that she was engaged in certain whistleblower activity. According to plaintiff, in February 2012, she questioned another employee about Taylor's residing in Maryland since "it was her understanding" that "legal supervisors employed by the District of Columbia" were required to live in the District. Am. Compl. ¶ 9. Plaintiff also alleges that she learned in February 2012 that Shreve "was running a private [property management company] called 'The

Shreve Group LLC'" and, on February 17, 2012, she asked Taylor if that constituted a conflict of interest for Shreve as head of the OTA.  Am. Compl. ¶¶ 13–15.  Taylor replied that Shreve's husband ran the company.  Am. Compl. ¶ 15.

Finally, the record includes a series of statements and emails concerning the manner in which plaintiff went about taking or requesting leave and the manner in which her superiors addressed it.  According to plaintiff, in February 2012, during a conversation with plaintiff about a leave request, Taylor allegedly "instructed [p]laintiff to address [Shreve] as though she were a judge [and] stated that [p]laintiff did not understand what was required in 'American culture[.]'" Am. Compl. ¶ 12.

Plaintiff was fired on February 21, 2012, and was issued a Summary Removal Notice on February 24, 2012, signed by Shreve.  Removal Notice, Defs.' Ex. 13, [Dkt. # 64-13].  As grounds for plaintiff's termination, the removal notice sets out ten counts:

- Count One – Misfeasance and Insubordination: Copying the Executive Office of the Mayor with Your Disrespect of Superiors.

- Count Two – Malfeasance by Unauthorized Practice of Law:  Preparation of Legal Documents.

- Count Three – Malfeasance by Unauthorized Practice of Law; Unauthorized Drafting of Legal Documents.

- Count Four – Malfeasance by Unauthorized Practice of Law and Insubordination by Violation of OTA Bulletin No. 2010-001: Participation in Mediation Conducted By the Office of Administrative Hearings.

- Count Five – Malfeasance by Unauthorized Practice of Law: Provision of Legal Advice and Preparation of Legal Documents.

- Count Six – Malfeasance by Unauthorized Practice of Law: Advising a Tenant to Fire an OTA Attorney.

- Count Seven – Insubordination: Disobeying a Direct Order From Your Supervisor.

- Count Eight – Misfeasance: Boasting to a Member of the Public of Your Disrespect of a Superior.

- Count Nine – Unauthorized Practice of Law and Insubordination: Use of Degree Designation 'JD' in Email Signature Block.

- Count Ten – Insubordination: Disobeying Repeated Direct Orders to Avoid Practice of Law.

Removal Notice at 1–8. Each count is followed by at least one explanatory paragraph describing the offending behavior.

The events on the date of plaintiff's actual departure also form the basis for a count in the complaint: according to plaintiff, when Shreve informed plaintiff of her termination, she "demanded that [p]laintiff turn in her employee identification badge and cell phone, and leave the building" or be escorted out by a security guard. Am. Compl. ¶ 16. When plaintiff asked to discuss the matter further, Shreve "stood up and moved closely toward [p]laintiff[,] . . . raised her hand, slammed it on the table, and yelled 'I am done with you!" Am. Compl. ¶ 17. Plaintiff alleges that she "felt physically afraid, and quickly left [Shreve's] office." She "had less than a half hour to remove her belongings . . . and leave the building after four and a half years of service." Am. Compl. ¶ 18.

Plaintiff alleges that prior to her termination, she "had consistently received good job performance review [and] compliments from the many tenants she . . . served." Am. Compl. ¶ 19. Plaintiff alleges further that she "was just six months away from having fully vested retirement benefits" at the time of her termination. Am. Compl. ¶ 20.

In the Second Amended Complaint, which was drafted by then-appointed counsel,[3] plaintiff brought seven causes of action:

(1)     Wrongful Termination in Violation of Public Policy, Am. Compl. ¶¶ 26–29;

(2)     Retaliation in Violation of the District of Columbia Whistleblower Protection Act, *id.* ¶¶ 30–34;

(3)     Discrimination in Violation of the District of Columbia Human Rights Act, *id.* ¶¶ 35–41;

(4)     Wrongful Termination in Violation of Title VII of the Civil Rights Act of 1964, as Amended, *id.* ¶¶ 42–45;

(5)     Breach of Contract, *id.* ¶¶ 46–50;

(6)     Intentional Infliction of Emotional Distress, *id.* ¶¶ 53–56;

(7)     Assault, *id.* ¶¶ 57–60.[4]

---

3       In February 2013, the Court appointed counsel to represent plaintiff.  *See* Feb. 20, 2013 Order [Dkt. # 11].  On April 4, 2014, after counsel's filing of two amended complaints, the Court relieved counsel from the appointment order upon plaintiff's consent to counsel's motion to withdraw "due to irreconcilable differences."  Apr. 8, 2014 Order [Dkt. # 40].  Thereafter, plaintiff conducted the case *pro se*.  The Court later appointed counsel for the limited purpose of representing plaintiff during mediation proceedings before a magistrate judge.  *See* May 21, 2014 Order [Dkt. # 44].  That appointment expired automatically at the conclusion of the mediation referral.  *See* July 31, 2014 Min. Order (concluding mediation).

4       On October 22, 2014, the Court denied plaintiff's motion for leave to file yet another amended complaint to add a disability discrimination claim since the motion came after the close of an extended period of discovery, two amended complaints, an unsuccessful mediation, and the start of briefing dispositive motions, and the proposed amended complaint was unlikely to survive a motion to dismiss.  *See* Oct. 22, 2014 Mem. Op. and Order [Dkt. # 67].

## II.     LEGAL STANDARD

Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, admissions on file and affidavits show that "there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  A dispute is "genuine" only if a reasonable fact-finder could find for the nonmoving party; a fact is "material" only if it is capable of affecting the outcome of the litigation.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987).

When, as here, both parties file motions for summary judgment, "each must carry its own burden under the applicable legal standard."  *Ehrman v. United States*, 429 F. Supp. 2d 61, 67 (D.D.C. 2006).  "The rule governing cross-motions for summary judgment . . . is that neither party waives the right to a full trial on the merits by filing its own motion; each side concedes that no material facts are at issue only for the purposes of its own motion."  *Hodes v. U.S. Dep't of Treasury*, 967 F. Supp. 2d 369, 373 (D.D.C. 2013), *appeal dismissed sub nom.*, *Hodes v. U.S. Dep't of the Treasury*, No. 13-5348, 2014 WL 590992 (D.C. Cir. Jan. 21, 2014) (citations and internal quotation marks omitted).  In assessing each party's motion, the Court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the summary judgment motion.'"  *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alterations omitted), quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam).

## III.    ANALYSIS

### A.     Title VII and D.C. Human Rights Act Claims

Congress enacted Title VII of the Civil Rights Act of 1964 to implement "the federal policy of prohibiting wrongful discrimination in the Nation's workplaces."  *Univ. of Tex. Sw. Med. Ctr.*

*v. Nassar*, 133 S.Ct. 2517, 2522 (2013). The antidiscrimination provision "makes it unlawful for an employer 'to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race'" or other protected characteristics. *Steele v. Schafer*, 535 F.3d 689, 695 (D.C. Cir. 2008), quoting 42 U.S.C. § 2000e–2(a). To state a claim under Title VII's anti-discrimination provision, the plaintiff need only establish two elements: that "(i) [she] suffered an adverse employment action (ii) because of [her] race, color, religion, sex, national origin, age, or disability." *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008), citing 42 U.S.C. § 2000e–16(a). Title VII also includes an anti-retaliation prong that makes it unlawful for "an employer [to] 'discriminate against' an employee . . . because that individual 'opposed any practice' made unlawful by Title VII or 'made a charge, testified, assisted, or participated in' a Title VII proceeding or investigation." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 56 (2006), quoting 42 U.S.C. § 2000e–3(a); *see also Steele*, 535 F.3d at 695.

Title VII claims may be proved by direct or circumstantial evidence. "Direct evidence of discriminatory intent alone is sufficient to survive summary judgment." *Robinson v. Red Coats, Inc.*, 31 F. Supp. 3d 201, 216 (D.D.C. 2014), citing *Stone v. Landis Constr. Corp.*, 442 Fed. Appx. 568, 569 (D.C. Cir. 2011) (per curiam). Hence, a statement that itself shows bias in the adverse decision is direct evidence that would generally entitle a plaintiff to a jury trial. *Vatel v. Alliance of Auto. Mfrs.*, 627 F.3d 1245, 1247 (D.C. Cir. 2011); *see Wilson v. Cox*, 753 F.3d 244, 247 (D.C. Cir. 2014) ("A statement that itself shows . . . bias in the employment decision qualifies as direct evidence.") (citation and internal quotation marks omitted) (ellipsis in original). "While courts have not precisely defined what constitutes direct evidence, it is clear that at a minimum, direct evidence does not include stray remarks in the workplace, particularly those made by nondecision-

makers or statements made by decisionmakers unrelated to the decisional process itself." *Hajjar-Nejad v. George Washington Univ.*, 37 F. Supp. 3d 90, 125 (D.D.C. 2014) (citation and internal quotation marks omitted). "Discrimination claims under the D.C. Human Rights Act [are analyzed] in the same way." *Id.* at 1246.

### 1.   Direct Evidence of Discrimination

Plaintiff posits that she has come forward with direct evidence of discriminatory bias in the decision to terminate her. But nothing she identifies rises to that standard.

Plaintiff points to a series of communications with director Shreve and supervisor Taylor as direct evidence of national origin discrimination against her. The series of events stem from an email plaintiff sent to Shreve and Taylor in February 2012. That email is not identified in the record, but it forms the basis of Count One of the removal notice for misfeasance and insubordination.

As Shreve recounted in the removal notice, plaintiff sent an email on February 11, 2012, to Shreve and Taylor, stating "I will be taking off the week of 20 to 24." Removal Notice at 1. Plaintiff explained that she "had not entered anything in PeopleSoft because, 'right now my balance hours do not show that there are enough hours although there will be enough by the end of the month.'" *Id.* at 1–2. Shreve took issue with the fact that the statement "was not posed as a request." *Id.* at 1 (Count One). Shreve "requested that Mr. Taylor meet with [plaintiff] to discuss the situation and [her] word choices," which he did. *Id.* at 2. In her deposition testimony, plaintiff recounts her discussion with Taylor about Shreve's response to the leave request:

> [He] said . . . why don't you talk to [Shreve] like – as though a judge? . . . I thought that was kind of silly, so I kind of made a joke like, "Oh, yes, the Honorable Shreve" and  . . . then he made some remark saying, 'Well in this country, you have to address people in a certain" – or whatever it was.  And it was addressed to me in such way as if I didn't know anything about American culture, like I was a foreigner.

Sun Dep. at 109:14–110:2.

As is set forth in the removal notice, Taylor discussed with plaintiff Shreve's "inability to approve any leave when PeopleSoft does not indicate that the hours are available, and . . . the value of following general principals of courtesy when submitting requests, which use words such as 'May' and 'Request,' as opposed to demands, which use words such as 'I will.'"  Removal Notice at 2.  Apparently, plaintiff explained that she had "always appropriately used words such as 'I will' when working as an independent contractor" at a law firm and, thus, "viewed the language as appropriate for use in the OTA office culture."  *Id*.  Plaintiff stated in the meeting with Taylor that she "might need to bring the Mayor into the decision process, and Mr. Taylor recommended against such an attempt."  *Id*.

On February 17, 2012, plaintiff sent another email to Taylor and sent a copy to the Mayor as well.  Removal Notice at 2.  Plaintiff wrote to the Director of the agency "that Mr. Taylor had suggested that [she] 'should most respectfully submit my petition to our esteemed chief tenant advocate.'"  Removal Notice at 2; Sun Feb. 17, 2012 Email, Defs.' Ex. 14, [Dkt. # 64-14].  Shreve found plaintiff's statements in that email, including what Shreve described as "a blatant mischaracterization" of Taylor's statements, to be insubordinate to her and to OTA.  Removal Notice at 2.  Shreve explained to plaintiff in the removal notice that by adding Mayor Gray to the distribution list, "you were expanding the reach of your insubordination beyond the OTA and into the Executive Office of the Mayor."  *Id*. at 3.

Plaintiff points to the count in the removal notice arising out of this series of exchanges as evidence of the alleged national origin discrimination. She complains that Shreve's "extraordinary step in using a simple English grammatical construction in the future tense as a 'count' is direct evidence of her racial hostility, as if Plaintiff could not understand English." She argues that a jury can find that the fact that defendant predicated a count on plaintiff's use of the words 'I will' "is direct evidence of discrimination." Pl.'s Opp. to Defs.' Mot. for Summ. J. [Dkt. # 82] (Pl.'s Opp.) at 20. But this first example does not rise to the level of direct evidence of discrimination on Shreve's part.

Plaintiff also points to a sentence in a lengthy email from Taylor dated February 17, 2012, in which he addresses plaintiff's ongoing difficulties with Shreve:

> Linda,
>
> Even though I am always concerned when people maintain leave balances as "close to the bone" as you do, I am glad to hear the balances have been updated.
>
> Yes, I freely admit to discussing with you that "announcing" that you are taking additional leave is a poor approach in American culture. Certainly, I understand that your previous strategies for preparing for the bar exam have not been successful, and you want to devote as much time to preparation as possible. I am so glad that you are finding the PMBR course helpful, just as I was glad when you found other preparation courses helpful.
>
> However, you seem to fail to grasp the role of an agency director in the leave process. M. Shreve has a responsibility to the District's tenants, citizen's, and government to maintain a level of services, and she has a responsibility to treat everyone in our small agency with fairness. No rational person would conclude that each employee has an absolute right to take off work at their sole individual discretion. While it might seem far fetched, what if everyone in the agency decided to take next week off? As an agency, we would just cease to exist for a week!
>
> It is Ms. Shreve's responsibility to balance the needs of her staff with a need to maintain services for the people. That is a large reason why the system is set is designed [sic] as it is. When someone voices a desire to not work for a period of time, be it one hour or one month, the Director must evaluate the bigger picture and determine a course of action that best acknowledges the employee's needs without compromising all the other needs for which she is responsible. Once having balanced the competing interests, she has the authority to make a decision.

The fact that someone other than you has the authority to determine if you can take off work, and still be paid, is why I suggested to you that you would be better served by the phrase, "MAY I take leave," than by the phrase, "I AM taking leave." The announcement, "I am taking . . ." fails to recognize that someone else has to agree to your plan before you may put your plan into action.

You appear to have turned my simple explanation of common courtesy in American culture, and suggestion that in this culture you are more likely to make a positive impression if you exhibit courtesy, into a suggestion that you become fawningly obsequious. Nothing could be further from the truth. Maybe I should have anticipated that you would approach Ms. Shreve and Mayor Gray with a display of sarcasm. You did indicate that you would write your friend, the Mayor, and he would order Ms. Shreve to give you whatever you wanted. I told you that I did not expect that approach to be effective, but you obviously disagree. I suppose Mr. Gray will ultimately decide whether he thinks your style is appropriate and effective, and if it merits his personal intervention.

You will recall that for the day you want to take off because you have an appointment with your audiologist, I suggested that you "request," not "demand," the five hours sick leave that PeopleSoft said were available, and then "request," not "demand," the rest of the day off . . . .

Taylor Feb. 17, 2012 Email, Large Additional Attachments [Dkt. # 83] at 4.

According to plaintiff, she made the leave request "*precisely* as a matter of courtesy." Pl.'s Opp. at 20 (italics in original). She asserts that Taylor "further distorted" her words by rephrasing them as "'I <u>am</u> taking leave,' instead of 'I <u>will</u> be taking leave,' intentionally projecting an animus towards Plaintiff as a result of her simple gesture of courtesy." *Id.* (emphasis in original).

Taylor's February 17, 2012 email was certainly a little condescending, and it repeated an unnecessary reference to plaintiff's cultural differences. But it responded to the February 17 email from plaintiff that was dripping with sarcasm, Sun Feb. 17, 2012 Email [Dkt. # 64-14] at 3, and it falls short of direct evidence of discriminatory animus. More important, while plaintiff's approach to leave and her appeal to the Mayor seem to have caused considerable consternation, Taylor's

February 17 email had nothing to do with the adverse employment decision underlying this lawsuit.[5]

As further evidence of discrimination, plaintiff states that "shortly before [the foregoing] episode," she had asked Taylor about the possibility of working as an Attorney Advisor after she passed the Bar to which he responded that it was not possible "because first of all there was another attorney already barred." Pl.'s Opp. at 20–21. Plaintiff states that the other attorney was a younger, less qualified, African-American, *id.* at 21, but it is unclear if the latter statement is plaintiff's observation of the barred attorney or Taylor's actual statement, and plaintiff has not cited any document or sworn evidence to clarify this conversation. In any event, merely referring to a co-worker of another race or ethnicity in a conversation having nothing to do with an adverse determination is not direct evidence of unlawful discrimination in that determination. *Cf. Ayissi–Etoh v. Fannie Mae*, 712 F.3d 572, 576 (D.C. Cir. 2013) (per curiam) (finding supervisor's "young black man statement alone" during conversation about a pay raise to be direct evidence of race discrimination based on denial of raise).

Finally, in recounting the direct evidence of discrimination, plaintiff states that "Defendant [via Taylor] suggested [she] should work for a female Chinese lawyer he described as a 'bull,'

---

5      Indeed, plaintiff's own exhibit indicates that as far back as March 2011, Shreve had raised problems with plaintiff's taking leave without prior approval. *See* Shreve Apr. 6, 2011 Email [Dkt. # 83] at 2 (plaintiff's email response to Shreve's March 10, 2011 email instructing plaintiff that "going forward you need to put in the absence request prior not post to the action taken otherwise I will not approve"). In an April 6, 2011 email response to plaintiff's disagreement with Shreve's decision, Shreve wrote "in addition to me clearly making the statement during a previous staff meeting regarding this matter, I also verbally instructed you regarding the issue of approaching me on the day to request a[n] absence. Further, you had a client appointment that apparently you forget [sic] because the client came in after you had left for said appointment. My decision stands." *Id.*

presumably because Plaintiff has persevered in taking the bar exam despite repeated failures and thereby exhibited a likewise tenacity."  Pl.'s Opp. at 21, citing *generally* Sun Dep.  Plaintiff then concludes: "In this juxtaposition of cultural characteristics Defendant demonstrated his discriminatory intent, and a jury could find that he discriminated against Plaintiff despite her ability to perform job duties."  *Id*.  Once again, Taylor's reference to plaintiff's ethnicity was insensitive and inappropriate, but it had nothing to do with her termination or performance evaluation.  And plaintiff herself drew the conclusion that Taylor was admiring her perseverance, not disparaging her.

In order to find for plaintiff on the discrimination claims, a jury would need to draw the inference that plaintiff's supervisors were biased from the foregoing statements, and then tie that bias to the decision to terminate plaintiff's employment.  Since "direct evidence of discrimination is evidence that, if believed by the fact finder, proves the particular fact in question *without any need for inference*," *Hajjar-Nejad*, 37 F. Supp. 3d at 125 (emphasis in original), the proffered statements do not constitute direct evidence of the alleged unlawful discrimination.  *See Macy v. Hopkins Cnty. Bd. of Educ.*, 429 F. Supp. 2d 888, 898 (W.D. Ky. 2006), *aff'd sub nom.*, *Macy v. Hopkins Cnty. Sch. Bd. of Educ.*, 484 F.3d 357 (6th Cir. 2007) ("Evidence of discrimination is not considered direct evidence unless a discriminatory motivation is explicitly expressed."); *see also Forman v. Small*, 271 F.3d 285, 293 (D.C. Cir. 2001), quoting *Hunt v. City of Markham*, 219 F.3d 649, 653 (7th Cir. 2000) ("[W]hen decision makers, or those who have input into the decision, express [ ] discriminatory feelings [*i.e.*, series of comments implicitly referring to age] around the relevant time in regard to the adverse employment action complained of, 'then it may be possible *to infer* that the decision makers were influenced by those feelings in making their decisions.'").

16

Plaintiff indicates that the alleged offending remarks occurred "closely in time" to her termination, Pl.'s Opp. at 21, but of the four documents she identifies, only Taylor's February 17, 2012 response to the leave request is dated close to plaintiff's February 21, 2012 termination date. *See id.* 20–21, n.32 & 33, citing emails at Large Additional Attachments [Dkt. # 83].[6]  The remaining documents are: (1) an email from Shreve dated November 30, 2011, denying plaintiff's leave request and commenting that "it seems to me that you should ask for a half of day.  The current request indicates two hours and with traveling time its [sic] hard to believe that you could return to work within an hour of the work being completed," Shreve Nov. 30, 2011 Email [Dkt. # 83] at 1, and (2) an email exchange between plaintiff and Shreve dated April 5–6, 2011, disagreeing about the timing of plaintiff's leave request and ending with Shreve's informing plaintiff that "going forward[,] you need to put in the absence request prior not post to the action taken otherwise I will not approve."  Sun and Shreve Apr. 6, 2011 Emails [Dkt. # 83] at 2.  And plaintiff has not pointed to any other place in the record confirming any other alleged statements and when they were made in a way that would tie them to the termination decision.

## 2.    Indirect Evidence of Discrimination

In the absence of direct evidence that defendants discriminated against plaintiff due to her Chinese ancestry, plaintiff must prove her discrimination claim through the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  As

---

6    Plaintiff's citations to the record are far from ideal.  The Court has given her considerable leeway as a *pro se* party and where possible has matched plaintiff's cited footnotes with the corresponding exhibit.  But the Court's duty to construe *pro se* filings liberally has its limits, and it is not the Court's job to canvass the record for documents supporting a *pro se* party's position. *See* October 20, 2014 Order [Dkt. # 65] (advising plaintiff about responding to a summary judgment motion).

discussed below, defendants have asserted legitimate, nondiscriminatory reasons for plaintiff's termination.  Hence, the Court is left with "one central inquiry":  whether plaintiff has "produced evidence sufficient for a reasonable jury to find that the employer's asserted non-discriminatory reasons were not the actual reasons and that the employer intentionally discriminated against the plaintiff on a prohibited basis." *Adeyemi v. District of Columbia*, 525 F.3d 1222, 1226 (D.C .Cir. 2008), citing *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 495 (D.C. Cir. 2008); *see accord Morales v. Gotbaum*, 42 F. Supp. 3d 175, 188 (D.D.C. 2014) (citing cases).  In assessing this question, the Court is required to consider "all the evidence, which includes not only the prima facie case but also the evidence the plaintiff offers to attack the employer's proffered explanation for its action . . . ." *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009), quoting *Carter v. George Wash. Univ.*, 387 F.3d 872, 878 (D.C. Cir. 2004) (internal quotation marks omitted).

In the removal notice, Shreve sets out ten specific reasons for plaintiff's termination and cites District of Columbia personnel regulations.  More than half of the reasons relate to plaintiff's unauthorized practice of law in violation of D.C. Court of Appeals Rule 49(a), which "prohibits engaging in the practice of law in the District of Columbia unless enrolled as an active member of the District of Columbia Bar."  Removal Notice at 3–10 (Counts Two, Three, Four, Five, Six, Nine).[7]  Each reason describes the offending behavior and adds that "in addition to being in violation of [D.C.] law, the unauthorized practice of law compromises the integrity of the [OTA]." *Id.*  Those counts alone suffice as legitimate, nondiscriminatory reasons for plaintiff's termination,

---

7       Subsection (a) of Rule 49 titled Unauthorized Practice of Law reads:  "No person shall engage in the practice of law in the District of Columbia or in any manner hold out as authorized or competent to practice law in the District of Columbia unless enrolled as an active member of the District of Columbia Bar, except as otherwise permitted by the Rules."  D.C. Court of Appeals Rule 49(a) (Mar. 20, 2008).

as do the specific incidences of insubordination, *see* Removal Notice at 1–8 (Counts One, Seven, Ten), and misfeasance, *id.* at 7–8 (Count Eight), since all of the reasons relate to plaintiff's job performance and none supports an inference of a discriminatory motive.

Since defendants have proffered a legitimate explanation for plaintiff's termination, the burdens shifts back to the plaintiff to demonstrate why defendants are not entitled to judgment as a matter of law.  In the context of the discrimination claim, plaintiff may defeat summary judgment by proving either that defendants' legitimate, nondiscriminatory reasons are a pretext for discrimination, *McDonnell Douglas*, 411 U.S. at 803, or that the employment action was motivated by discrimination in addition to the proffered legitimate reasons.  *Nassar*, 133 S.Ct. at 2522–23; *Fogg v. Gonzales*, 492 F.3d 447, 451 (D.C. Cir. 2007); *see also Ginger v. District of Columbia*, 527 F.3d 1340, 1345 (D.C. Cir. 2008) (explaining the difference between a "single motive" and a "mixed-motive" disparate treatment case).  In the context of the retaliation claim, plaintiff must establish that retaliation was the "but-for cause" of the adverse action in order to survive summary judgment.  *Nassar*, 133 S. Ct. at 2533.  "This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."  *Id.*

In both contexts, plaintiff "bears the ultimate burden of proving that discriminatory [or retaliatory] animus was the determining cause of the personnel action." *Lancaster v. Vance-Cooks*, 967 F. Supp. 2d 375, 393 (D.D.C. 2013), citing *Ford v. Mabus*, 629 F. 3d 198, 201 (D.C. Cir. 2010) (other citation omitted).  Pretext may be established by showing either "that a discriminatory reason more likely motivated the employer or . . . that the employer's proffered explanation is unworthy of credence." *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 256 (1981).  Even if the employer's explanation is shown to be false, "an employer [still] would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory

reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." *Colbert v. Tapella*, 649 F.3d 756, 759 (D.C. Cir. 2011). Courts "may not 'second-guess an employer's personnel decision absent demonstrably discriminatory motive.'" *Fischbach v. District of Columbia Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996), quoting *Milton v. Weinberger*, 696 F. 2d 94, 100 (D.C. Cir. 1982).

The Court finds that plaintiff has not carried her burden of persuasion. Plaintiff first disputes defendants' allegation that she engaged in the unauthorized practice of law. She states that she was simply a participant in mediation proceedings and that Rule 49 does not cover mediation. Pl.'s Reply [Dkt. # 88] at 18. But plaintiff does not cite a provision of the rule for that proposition, and the exceptions set out at subsection (c) of Rule 49 do not support her interpretation. Indeed, subsection (c)(12), captioned "Practice in ADR Proceedings" specifies that attorneys must be licensed in order to represent individuals in "legal services in or reasonably related to a pending or potential arbitration, mediation, or other alternative dispute resolution . . . proceeding."

Defendants explain that Rule 49 permits unlicensed individuals to serve as impartial mediators, but that it bars plaintiff's role as an advisor to OTA clients. *See* Defs.' Opp. to Pl.'s Summ. J. Mot. [Dkt. # 81] ("Defs.' Opp.") at 10–11. The Court agrees. The Commentary to Rule 49(b)(2) states that the rule "is not intended to cover the provision of mediation or alternative dispute resolution (ADR) services" because such services "are not given in circumstances where there is a client relationship of trust or reliance; and it is common practice for providers of ADR services explicitly to advise participants that they are not providing the services of legal counsel."

D.C. Court of Appeals Rule 49, cmt. § 49(b)(2).   So plaintiff has not shown the proffered nondiscriminatory reason to be false.[8]

Moreover, even if defendants were wrong in their application of the rule, that would not defeat summary judgment because plaintiff has provided no probative evidence of a discriminatory motive.

According to plaintiff, the "discrimination" began "when Mark Raddatz, a Caucasian, self-appointed landlord attorney . . . , complained to Defendant about Plaintiff's 'unauthorized practice of law' when Plaintiff helped [Carmen] Salazar," a native of Ecuador whom plaintiff claims had limited English skills, "complete a tenant petition."   Pl.'s Reply at 18.   Plaintiff contends that defendants "misunderstood what mediation at OAH entailed, or, if they did, they deliberately ignored it."   *Id.*   In any event, according to plaintiff, Taylor instructed her to tell Ms. Salazar that Ms. Kosak would be representing her instead.   Plaintiff notes that there was no written representation, and that "she could not impose herself on Ms. Salazar without her consent."   *Id.*

---

8       Moreover, there is considerable evidence in the record that demonstrates that plaintiff was repeatedly cautioned about the issue, and that the concerns were not simply raised in the mediation context.   *See, e.g.,* Taylor Email [Dkt. # 64-9] at 1 (Taylor's admonition to plaintiff regarding misleading statements in the email to attorney Parag Khandhar that could have reasonably inferred that plaintiff was a lawyer); Cohn Jun. 25, 2010 Email [Dkt. # 64-7] (OTA Legislator Director's email to Shreve about the concerns conveyed to him by Judge Long that she and other administrative law judges had about plaintiff's appearances at hearings and mediation and the "unauthorized practice of law").   The evidence also reflects plaintiff's unwillingness to respond to the concerns in any meaningful way.   *See* Sun Feb. 12, 2009 Email [Dkt. # 64-9] at 2 (plaintiff's retort to Taylor's misleading statement email, all but stating that Taylor was jumping to conclusions without knowing the facts); Sun Sept. 5, 2009 Email [Dkt. # 64-10] (plaintiff's September 5, 2009 email to Taylor, stating "[w]e need to find out what constitutes unauthorized practice in our particular are[a] of work, as I know the other advocates also regularly help write tenant petitions . . . . You had mentioned on a previous occasion that unauthorized practice of law would prohibit me from getting a license.   While I appreciate your concern, I do not think it is relevant to our discussion at this point (maybe after I pass the bar).").

Plaintiff reports that when Taylor "insisted, Plaintiff said to him, 'Don't try to control me,' to which Defendant replied in a display of animus, 'Oh, yes, I will.'  Plaintiff then asked Defendant to stop discrimination."  Pl.'s Reply at 19.  Plaintiff argues that defendants' "improper acts . . . showed 'unauthorized practice of law' was not the real reason why" she was not permitted to assist Ms. Salazar, but rather [ ] was pretext for discrimination."[9]  *Id.*

Plaintiff's argument is illogical and unsupported by the evidence in the record.  In any event, plaintiff does not dispute the conduct underlying her termination but rather questions defendants' interpretation of that conduct as constituting the unauthorized practice of law.  *See generally* Pl.'s Opp. at 43–45 (Summ. of Material Facts in Genuine Dispute); Pl.'s Mot. for Summ. J. (Stmt. of Material Facts Not in Reasonable Dispute) at 9–12; Pl.'s Mot. for Summ. J. (Pl.'s Supporting Mem.) at 4–5 (Table of Contents listing argument against allegation of unauthorized practice of law).  But that question is relevant only if a reasonable jury could find no support for the counts of the removal notice *and* a prohibited discriminatory purpose.  Rule 49's definition of "Practice of Law" encompasses preparing "any claims, demands or pleadings of any kind, or any written documents . . . for filing in any court, administrative agency or other tribunal" and "[p]roviding advice or counsel as to how [such] activities . . . might be done, or whether they were done, in accordance with applicable law."  D.C. Court of Appeals Rule 49(b)(2)(D)–(E).  Counts Two through Six of the removal notice certainly fall within that definition.  Moreover, plaintiff does not refute the conduct underlying the insubordination counts, which also provide legitimate, nondiscriminatory reasons for plaintiff's termination.

---

9      Plaintiff also argues that defendants' "intentional discrimination extended to the foreign-born tenants [she] served," Pl.'s Reply at 19–20, but she does not have legal standing to assert the tenants' claims and, as a lay person, she cannot represent them in federal court.

Even if plaintiff felt offended by Taylor's remarks or disagreed with his supervision, Title VII does not create or require federal courts to enforce "a general civility code for the American workplace." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. at 68, quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998).  Hence, the mere fact that plaintiff and Taylor clashed does not supply the evidence from which a reasonable jury can find or infer unlawful discrimination.  *See*, *e.g.*, *Bonnette v. Shinseki*, 907 F. Supp. 2d 54, 70 (D.D.C. 2012) (despite complaint detailing "a series of annoying and embarrassing workplace grievances[,] . . . the law is clear that 'purely subjective injuries,' such as dissatisfaction with a reassignment, public humiliation, or loss of reputation, are not adverse actions[.]").

In fact, plaintiff admitted in her deposition testimony that she "[p]ersonally" did not "think" that Taylor had "any prejudices one way or the other" but was instead "very pompous" and controlling, which "created a very antagonistic attitude."  Sun Dep. at 115:9–14, 116:1–3.  And she acknowledged that she thought she was fired because Taylor did not like her and perceived her as undermining him and incapable of being controlled.  Sun Dep. at 105:7–20.  In addition, plaintiff could not identify "any overt act of discrimination" on Shreve's part and, when pressed, she surmised that Shreve "is much too smart to do that . . . She made sure with Mr. Taylor – and I have an e-mail . . . by Mr. Taylor – that they wanted to make sure that whatever termination action they took would not be challenged."  Sun Dep. at 155:11–156:21.

In keeping with the *McDonnell Douglas* framework, the Court finds that plaintiff has failed to produce probative evidence to rebut defendants' legitimate nondiscriminatory reasons for her termination.  Consequently, the Court will grant summary judgment to defendants on the Title VII claim (Count IV) and the D.C. Human Rights Act claim (Count III).

B.      **Other State Law Claims**

Since the remaining claims of wrongful termination, retaliation under the D.C. Whistleblower Protection Act ("DCWPA"), breach of contract, intentional infliction of emotional distress, and assault "are so related [to the Title VII claim] that they form part of the same . . . controversy," the Court will exercise supplemental jurisdiction over those claims.  28 U.S.C. § 1367(a).  The Court will address the statutory claim and then the common law claims.

1.      **D.C. Whistleblower Protection Act**

In Count II, plaintiff claims "Retaliation in Violation of the District of Columbia Whistleblower Protection Act."  Am. Compl. ¶¶ 30–34.  To survive summary judgment on a DCWPA claim, plaintiff must supply probative evidence that (1) she made a protected disclosure, (2) the disclosure resulted in a prohibited personnel action, and (3) the disclosure was a contributing factor to the prohibited personnel action.  *Bowyer v. District of Columbia*, 793 F.3d 49, 52 (D.C. Cir. 2015).  A protected disclosure "includes 'any disclosure of information . . . that the employee reasonably believes evidences . . . gross mismanagement . . . or a violation of a federal, state, or local law.'"  *Id.*, quoting D.C. Code § 1-615.52(a)(6) (internal brackets omitted; ellipses in original).

Plaintiff alleged that she questioned another employee about Taylor's residing in Maryland since "it was her understanding" that "legal supervisors employed by the District of Columbia" were required to live in the District.  Am. Compl. ¶ 9.  Plaintiff also alleged that she learned in February 2012 that Shreve "was running a private [property management company] called 'The Shreve Group LLC'" and, on February 17, 2012, she asked Taylor if that constituted a conflict of interest for Shreve as head of the OTA.  Am. Compl. ¶¶ 13–15.  Taylor replied that Shreve's husband ran the company. Am. Compl. ¶ 15.  In her summary judgment motion, plaintiff addresses

only the latter claim and argues that she was fired just four days after questioning Taylor about Shreve's potential conflict of interest.[10]  Pl.'s Mot. for Summ. J. (Pl.'s Supporting Mem.) at 21. Plaintiff concludes that "[t]he close proximity between Plaintiff's financial conflicts-of-interest remarks and termination is direct evidence of retaliation."  *Id*.

But, as with the discrimination claim, plaintiff has not pointed to any statements that would constitute direct evidence of a retaliatory motive for her termination.  Defendants contend that plaintiff did not believe she was making a protected disclosure when she questioned Taylor about the Shreve Group.  Defs.' SOF ¶ 17.  Indeed, in her deposition testimony, plaintiff stated that she did not "think that there was anything wrong with it.  I just wanted to know whether that was a conflict of interest.  And . . . even if it was a conflict of interest, maybe she was able to do it or she had arrangements to do it.  I had no idea."  Sun Dep. at 174:7–12.

In any event, the "DCWPA adopts a burden-shifting scheme that in some ways parallels federal Title VII jurisprudence," *Bowyer v. District of Columbia*, 793 F.3d at 52, and the Court has already determined with regard to the Title VII claim that plaintiff has "failed to point to any evidence countering [defendant's] legitimate, independent reason[s] for [her] termination."  *Id*. at 51.  Hence, the Court finds that defendants are entitled to summary judgment on the whistleblower claim as well.  *See id*. at 52, citing *Johnson v. District of Columbia*, 935 A.2d 1113, 1118 (D.C. 2007) ("If the defendant shows at summary judgment that there is no genuine issue of disputed fact as to its asserted legitimate, independent reason, the plaintiff . . . must come forward with credible [admissible] evidence [that a jury might credit] showing that the legitimate,

---

10      Plaintiff does not dispute, and thus concedes, that only Shreve, as Chief Tenant Advocate, was subject to the District's residency requirements.  Defs.' SOF ¶ 19.

independent reason the defendant offered was pretext for an actual, discriminatory motive or did not actually motivate the challenged personnel action.").

### 2.      Wrongful Termination

In Count I, plaintiff claims "Wrongful Termination in Violation of Public Policy."  Am. Compl. ¶¶ 26–29.  Generally, as an at-will employee, Defs.' Ex. 2, plaintiff could have been fired "at any time and for any reason, or for no reason at all."  *Adams v. George W. Cochran & Co., Inc.*, 597 A.2d 28, 30 (D.C. 1991).  The D.C. Court of Appeals has carved out "a very narrow [public policy] exception to the at-will doctrine under which a discharged at-will employee may sue . . . her former employer for wrongful discharge when the sole reason for the discharge is the employee's refusal to violate the law, as expressed in a statute or municipal regulation."  *Id.* at 34. In a subsequent plurality opinion, the D.C. Court of Appeals recognized that "*Adams* does not foreclose any additional 'public policy' exceptions," but three judges agreed that any exceptions should remain narrow.  *See Carl v. Children's Hosp.*, 702 A.2d 159 (D.C. 1997) (Terry, J., concurring) ("[L]est we allow 'public policy' exceptions to swallow up the at-will doctrine, I would also hold that the recognition of any such exception must be firmly anchored either in the Constitution or in a statute or regulation which clearly reflects the particular 'public policy' being relied upon.").  "[C]ourts have treated Judge Terry's concurring opinion as the relevant standard." *Myers v. Alutiiq Int'l Solutions, LLC*, 811 F. Supp. 2d 261, 266, n.3 (D.D.C. 2011), quoting *Vreven v. American Ass'n of Retired Persons*, 604 F. Supp. 2d 9, 14, n.5 (D.D.C. 2009).

The D.C. Court of Appeals has also questioned whether the "very narrow" public policy exception can be invoked "where the very statute the relied-upon public policy already contains a specific and significant remedy for the party aggrieved by its violation."  *Nolting v. Nat'l Capital Grp., Inc.*, 621 A.2d 1387, 1390 (D.C. 1993).  Since Title VII, the D.C. Human Rights Act, and

the DCWPA each contains a remedial scheme to address the very public policy issues plaintiff seeks to redress, the Court finds the public policy exception "inapplicable." *Mattiaccio v. DHA Grp., Inc.*, 293 F.R.D. 229, 233 (D.D.C. 2013). *See Rosella v. Long Rap, Inc.*, 2015 WL 4604295, at *4 (D.C. July 30, 2015) (identifying Title VII, the D.C. Human Rights Act, and the DCWPA as examples where "the legislature has seen fit to simultaneously create statutory exceptions to the employment-at-will rule by recognizing an employee's right to challenge wrongful discharges based on specific protections of public policy").

Accordingly, plaintiff's wrongful termination claim falls along with her statutory claims since plaintiff has not identified any other public policy that defendants are supposed to have violated.

### 3.     Breach of Contract

In Count V, plaintiff alleges that the District "intentionally breached its contractual commitments to [her] by terminating her employment without cause," Am. Compl. ¶ 50, and she invokes 42 U.S.C. § 1981.  Am. Compl. ¶¶ 46–52.  Section 1981 of the Civil Rights Act protects "the equal right of [a]ll persons within the jurisdiction of the United States to make and enforce contracts without respect to race."  *Brown v. Sessoms*, 774 F.3d 1016, 1022 (D.C. Cir. 2014), quoting *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 474 (2006) (internal quotation marks omitted).  It encompasses employment claims.  *See Ayissi–Etoh v. Fannie Mae*, 712 F.3d 572, 576 (D.C. Cir. 2013).

Defendants argue that D.C. employees are not hired pursuant to a contract, and therefore, they cannot sue under section 1981.  *See* Defs.' Mot. for Summ. J., Defs.' Mem. of P. & A. in Supp. of Defs.' Mot. for Summ. J. ("Defs.' Mem.") at 30.  But that argument "is one frequently raised by the District, but as often as it has been raised, it has been rejected."  *Bowyer v. District*

*of Columbia*, 910 F. Supp. 2d 173, 208 (D.D.C. 2012), *aff'd*, 793 F.3d 49 (D.C. Cir. 2015), quoting *Graves v. District of Columbia*, 777 F. Supp. 2d 109, 120 (D.D.C. 2011) (other citations omitted). This is in part because "the D.C. Circuit has held that 'members of the District of Columbia Fire Department are the counterparts of employees of state and local governmental units . . . . , and they retain an independent right of action under section 1981.'" *Id.*, quoting *Torre v. Barry*, 661 F.2d 1371, 1374–75 (D.C. Cir. 1981). *But see Olatunji v. District of Columbia*, 958 F. Supp. 2d 27, 34 (D.D.C. 2013) (holding "that plaintiff cannot maintain an independent cause of action under § 1981 against the District of Columbia"); *Sledge v. District of Columbia*, 869 F. Supp. 2d 140, 145 (D.D.C. 2012) (concluding same).

Defendants also argue that plaintiff was hired as a career service employee pursuant to statute and, thus, did not enter into a contract that could be breached. *See* Defs.' Mem. at 27–30; Am. Compl., Ex. 1 (letter appointing plaintiff "in the Career Service"). But a career service employee does have rights under the D.C. Comprehensive Merit Personnel Act ("CMPA") that an at-will employee does not. *See Fonville v. District of Columbia*, 448 F. Supp. 2d 21, 27 (D.D.C. 2006) ("At issue in this case is whether plaintiff's status changed from a Career Service employee to an 'at-will' employee when he was promoted to the Commander position."); *see also Ekwem v. Fenty*, 666 F. Supp. 2d 71, 78 (D.D.C. 2009), citing *Fonville*, 448 F. Supp. 2d at 26–27 (unlike career service employees, "Management Supervisory Service members are specifically excluded from the Career Service," and thus are not protected by the CMPA, which "creates a property interest for members of the Career Service"). Plaintiff touches on that distinction in her reply, *see* Reply at 18, and she raises the question of whether the CMPA creates an implied contract for career service appointees. *See Myers*, 811 F. Supp. 2d at 270, quoting *Austin v. Howard Univ.*, 267 F. Supp. 2d 22, 25 (D.D.C. 2003) ("The at-will employment presumption may be rebutted by

evidence that the parties intended the employment to be for a fixed period, o*r subject to specific precondition*s *before terminatio*n.") (other citation and internal quotation marks omitted) (emphasis supplied).  The Court cannot resolve that question on the current record, but whether or not plaintiff had contractual rights in her position, her claim fails because she has not produced evidence from which a jury could conclude that she was terminated without cause.

"To evaluate a section 1981 claim, courts use the three-step *McDonnell Douglass* framework for establishing racial discrimination under Title VII," *Brown v. Sessoms*, 774 F.3d at 1022 (internal quotation marks omitted), and this Court has already determined that no reasonable jury presented with defendants' legitimate, nondiscriminatory reasons for the termination could find for plaintiff on the discrimination claim.  It follows, then, that no reasonable jury could agree with the premise underlying the contract claim that the termination was without any cause.  Consequently, the Court finds that defendants are entitled to judgment as a matter of law on the breach of contract claim.

### 4.     Intentional Infliction of Emotional Distress ("IIED")

In Count VI, plaintiff alleges that defendants "were aware that its [sic] actions were in violation of the law, and as a result, they were either intentionally or recklessly caused."  Am. Compl. ¶ 54.  "In order to succeed on a claim of intentional infliction of emotional distress, a plaintiff must show (1) extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) cause[d] the plaintiff severe emotional distress."  *Duncan v. Children's Nat'l Med. Ctr.*, 702 A.2d 207, 211 (D.C. 1997), quoting *Drejza v. Vaccaro*, 650 A.2d 1308, 1312 (D.C. 1994).  The D.C. Court of Appeals has set "a very high bar for satisfying the requisite level of outrageousness," *Greene v. Shegan*, 2015 WL 5011419, at *3 (D.D.C. Aug. 24, 2015), which goes well beyond "mere insults, indignities, or annoyances," *id*., quoting

Restatement (Second) of Torts § 46, cmt. d (1965). And "[i]n the employment context, [the D.C. Court of Appeals has] traditionally [] been demanding in the proof required to support an [IIED] claim." *Joyner v. Sibley Mem'l Hosp.*, 826 A.2d 362, 373 (D.C. 2003), quoting *Kerrigan v. Britches of Georgetowne*, 705 A.2d 624, 628 (D.C. 1997).

Defendants argue that this claim fails "because the circumstances surrounding Plaintiff's discharge were not extreme and outrageous." Defs.' Opp. at 15. The Court agrees that plaintiff's conclusory allegations in the amended complaint do not rise to the requisite level of outrageousness to state an IIED claim. In addition, plaintiff has adduced no evidence to support this claim following an extensive period of discovery. Consequently, the Court finds that defendants are entitled to judgment as a matter of law on the IIED claim. *See Celotex Corp.*, 477 U.S. at 322 ("after adequate time for discovery and upon motion," summary judgment is warranted against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").

### 5.   Assault

In Count VII, plaintiff alleges that Shreve "assaulted and/or threatened [p]laintiff in a menacing manner during her termination . . . and caused [p]laintiff to fear for her safety." Am. Compl. ¶ 59. "Under District of Columbia law, an assault is 'an intentional and unlawful attempt or threat, either by words or acts, to do physical harm to the victim.'" *Collier v. District of Columbia*, 46 F. Supp. 3d 6, 14 (D.D.C. 2014), quoting *Etheredge v. District of Columbia*, 635 A.2d 908, 916 (D.C. 1993). To succeed on the assault count, plaintiff must present probative evidence that she "suffered apprehension of harmful or offensive contact and that a reasonable person in [her] position would have experienced such apprehension." *Id.*, citing *Rogers v. Loews L'Enfant Plaza Hotel*, 526 F. Supp. 523, 529 (D.D.C. 1981).

Defendants do not refute plaintiff's deposition testimony that during the termination meeting, Shreve "got up . . . raised her hand, put her face within a few inches of me, yelled and slammed her hand on the table . . . ." Sun Dep. 161.  Nor have defendants proffered any contrary version of the encounter.  While this may be a thin reed upon which to predicate a claim of assault, the question of whether plaintiff reasonably feared for her personal safety during the undisputed encounter is a question for a jury, not this Court.  So neither party is entitled to summary judgment on that claim.

## CONCLUSION

For the foregoing reasons, the Court concludes that defendants are entitled to summary judgment on Counts I through VI of plaintiff's Second Amended Complaint, but not on Count VII, which is not resolvable on summary judgment.  Accordingly, defendants' motion is granted in part and denied in part, and plaintiff's motion for summary judgment is denied.  A separate Order accompanies this Memorandum Opinion.

AMY BERMAN JACKSON
United States District Judge

Date:  September 30, 2015